# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Kathleen R. Faber and Lexis Mays, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>McDonald's U.S.A., LLC, MBM Management, Inc., Mac-Clark Restaurants, Inc., and ABC Corporations 1–100 d/b/a McDonald's,<br><br>Defendants. | Civil Action No. 1:24-cv-01246<br><br><br><br>**FIRST AMENDED COMPLAINT – COLLECTIVE ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kathleen R. Faber and Lexis Mays, by and through their attorneys, on behalf of themselves and others similarly situated, based on personal knowledge with respect to their own circumstances and based upon information and belief pursuant to the investigation of counsel as to all other allegations, allege the following:

## I. INTRODUCTION

1.     "Despite the health benefits of breastfeeding for both mothers and infants, too many nursing employees face obstacles to pumping breast milk in the workplace, making it difficult to continue breastfeeding while employed. Break time and a private space to express breast milk are critical [] supports for breastfeeding employees."[1] The House of Representatives reached these conclusions in 2021, after more than a decade of considering the plight of working mothers around the country. Since 2010, the Fair Labor Standards Act of 1938 ("FLSA") has required employers

---

[1] H.R. Rep. 117-102, at 3 (2021), *available at* https://www.congress.gov/117/crpt/hrpt102/ CRPT-117hrpt102.pdf. (last accessed July 8, 2024).

to provide nursing accommodations, but "[g]aps in the law limit access to [its] protections and le[ft] employees unable to recover in court when their employers fail to comply with the law's requirements."[2] Therefore, on December 29, 2022, Congress passed and the President signed the Providing Urgent Maternal Protections for Nursing Mothers Act (the "PUMP Act") to extend the FLSA protections "to more employees and ensure employees can recover appropriate forms of relief in court when employers violate the law."[3]

2. Despite already being required to comply with the FLSA breastfeeding requirements for more than a decade, after the PUMP Act came into effect, McDonald's U.S.A., LLC ( "McDonald's") along with MBM Management, Inc. ("MBM"), Mac-Clark Restaurants, Inc. ("Mac-Clark") and ABC Corporations 1–100 d/b/a McDonald's ("Franchisee Defendants") (collectively, with "McDonald's," the "Defendants") fail to provide a "reasonable break time for an employee to express breast milk" and fail to provide a "place . . . that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk," all of which is mandated by the PUMP Act. Instead, employees are forced to pump breast milk in unsanitary stock rooms, offices open to the rest of the staff, bathrooms, or their private vehicles. Defendants' failure to provide sufficient lactation accommodation is a systemic issue that has impacted employees at locations throughout the country.

3. Given this nationwide issue, Plaintiffs bring this collective action lawsuit against Defendants to seek a remedy that requires Defendants to comply with the law.

4. It has long been known that breastfeeding is crucial for a newborn baby and has numerous benefits for the mother and the child. The American Academy of Pediatrics recommends

---

[2] *Id.*

[3] *Id.*

breastfeeding exclusively for at least the first six months after birth and, ideally, until or after the child is twelve months of age.[4] Breast milk is an organic superfood that provides the essential nutrients and antibodies required for a baby's healthy growth and development. It can reduce the risk of various illnesses and infections and strengthen the infant's emotional and psychological development. Breastfeeding also has mental and physical benefits for the mother and for society at large.

5.      Not providing supportive accommodations for nursing mothers can have a negative impact on their physical, mental, and emotional health. Mothers unable to pump breast milk can experience engorgement, which can be painful and lead to infection. They also produce less milk for their babies. Not having sufficient time or space to pump can also result in increased feelings of stress, anxiety, and guilt for not being able to provide their babies with the best possible nutrition. Studies show that mothers who did not have access to a private place to pump breast milk were less likely to continue breastfeeding and achieve their breastfeeding goals, which increases their risk of mental health conditions like anxiety, postpartum depression, and stress.

6.      To ensure that employers provide reasonable break times and a private, non-bathroom space for breastfeeding employees to pump at work, Congress passed the Break Time for Nursing Mothers law (the "Pumping at Work Act") in 2010, which is the statute that amended the FLSA to require such accommodations. Unfortunately, it covered only non-exempt employees and with a weak enforcement mechanism, the law was "virtually useless in almost all practical

---

[4] Along with the World Health Organization, the U.S. Surgeon General's Office, and the American Academy of Family Physicians. *See* the Office of Personnel Management, *Guide for Establishing a Federal Nursing Mother's Program* (January 2013), at 2. Available at: https://www.opm.gov/policy-data-oversight/worklife/news/2013/1/opm-publishes-new-guide-for-establishing-a-federal-nursing-mother-s-program/ (last accessed July 8, 2024).

application[s]."[5] The 2022 PUMP Act corrected this defect by providing additional forms of relief for those harmed by their employer's failure to provide adequate time and space for nursing parents to pump. *See* 29 U.S.C. §§ 216(b) and 218d.

7.      Kathleen R. Faber was an employee of Defendants McDonalds and MBM. She worked at the McDonald's restaurant at 200 North Main Street in Haysville, Kansas. She gave birth to her child in September 2022 and commenced employment for Defendants McDonalds and MBM in January 2023 as a nighttime manager. Ms. Faber spoke with the General Manager about her pumping at work and was assured that it would not be a problem. However, Defendants McDonalds and MBM failed to provide her with a secure, private space and reasonable breaks to pump. Ms. Faber was forced to pump in the corner of the stock room to avoid the sight lines of the security cameras or, when she worked with male employees, in the bathroom. Ms. Faber also rarely had sufficient break times to pump, and for roughly half her shifts had no break at all to pump. In this way, Defendants McDonalds and MBM deprived her of her rights as a nursing mother guaranteed by the PUMP Act to a private, secure, and non-bathroom space to pump milk for her infant child.

8.      Plaintiff Lexis Mays is an employee of Defendants McDonalds and Mac-Clark and works at a restaurant located at 37 Meadow Street in Clinton, New York. She had her child in January 2023 and returned to work the last week of February 2023. Like Plaintiff Faber, Ms. Mays told management that she would be pumping at work. However, Defendants McDonalds and Mac-Clark failed to provide to provide her with a secure, private space and she could not pump each time she needed to. Ms. Mays had to pump in the back office, which does not have a door and is

---

[5] *Hicks v. City of Tuscaloosa*, No. 13-cv-02063, 2015 U.S. Dist. LEXIS 141649, at *99 (N.D. Ala. Oct. 19, 2015).

open to the rest of the crew members; crew members would come into the office every time she pumped at work. When Ms. Mays mentioned to her supervisors that there was no secure place to pump, they told her that no private space was available. Ms. Mays also had shifts during which she could not get a break and was unable to pump.

9.      As a result of the forgoing, Ms. Faber and Ms. Mays experienced anxiety, discomfort, and emotional distress. The lack of accommodation provided by Defendants McDonalds, MBM, and Mac-Clark caused Ms. Faber and Ms. Mays to experience embarrassment, anguish, personal hardship, anxiety, humiliation, and emotional distress.

10.     It would be relatively easy for Defendants to comply with the PUMP Act. For example, there are pre-fabricated temporary spaces that are commercially available for installation. These temporary spaces are easy to set up, affordable, and would satisfy Defendants' obligations under the PUMP Act. Examples of the spaces are those sold by Mamava,[6] Brighter Booth[7], and DayOne Baby[8], among many others. Images from those companies' websites show how such spaces could have been integrated into Defendants' space:



---

[6] https://www.mamava.com/all-products (last accessed July 8, 2024).

[7] https://brighterbooth.com (last accessed July 8, 2024).

[8] https://www.dayonebaby.com (last accessed July 8, 2024).

11.     Likewise, other companies are working to accommodate breastfeeding mothers with different easy to implement options, such as dedicating a room to breastfeeding in a public stadium[9] or permitting employees to use restaurant managers' locked offices to express milk.[10] Thus, while there are many ways to accommodate breastfeeding employees, Defendants have simply decided to not provide such accommodations.

12.     Defendants' failure to comply with the PUMP Act has significantly impacted Plaintiffs and other breastfeeding employees of Defendants. Instead of supporting breastfeeding mothers, Defendants' practices forced those mothers into a Hobson's choice between using demeaning, unsanitary spaces to express milk, abandoning pumping at work altogether, or quitting their jobs. Congress clearly declared in the PUMP Act that no mother should have to make such a choice.

13.     Plaintiffs seek redress for Defendants' violations of the PUMP Act by, *inter alia*, requiring Defendants to provide sufficient break time and a functional place, shielded from view and free from intrusion, which an employee may use to express breast milk.

14.     Plaintiffs bring this claim on behalf of themselves and a nationwide collective of employees at McDonald's restaurants across the country who were victims of Defendants' violations of the PUMP Act. Defendants have intentionally, willfully, and repeatedly harmed Plaintiffs and members of the Collectives by refusing to provide accommodations that they know they are obligated to provide under the PUMP Act.

---

[9]     *See* https://wvutoday.wvu.edu/stories/2023/09/07/new-dedicated-lactation-room-opens-to-the-public-at-milan-puskar-stadium (last accessed July 8, 2024).

[10]    *See* https://www.qsrmagazine.com/outside-insights/ask-restaurant-legal-professionals-how-accommodate-pregnant-and-breastfeeding (last accessed July 8, 2024).

15.     At all relevant times, the McDonald's Defendants controlled its franchisees' operations, including the McDonald's Franchisee Defendants. Indeed, in the McDonald's Franchise Agreement, it states:

> McDonald's operates a restaurant system ("McDonald's System"). The McDonald's System is a comprehensive system for the ongoing development, operation, and maintenance of McDonald's restaurant locations . . . . The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to . . . the use of only prescribed equipment and building layout and designs . . . and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation.[11]

16.     Through standardized training programs, operational manuals, and mandatory compliance with corporate policies and procedures, McDonald's exercised significant control over its franchisees including MBM and Mac-Clark and, by extension, the employees. McDonald's assures its brand and quality by requiring franchisees to adhere to strict brand standards and standardized programs, ensuring uniformity across all locations, which impacts franchisee operations, including employee working conditions and adherence to laws such as the PUMP Act. Indeed, Franchisees are required to "[k]eep the Restaurant[s] constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System. . . ."[12]

---

[11] *See* McDonald's Franchise Agreement, Nature and Scope of Franchise, Section 1, at 1.

12 Id., § 12(c); McDonald's Form 10-K for year ending December 31, 2022, at 20, available at: https://www.sec.gov/Archives/edgar/data/63908/000006390823000012/mcd-20221231.htm (last accessed October 17, 2023).

17.     Plaintiffs and the Collectives (defined below) would benefit from the issuance of a court-supervised notice of the present lawsuit and be allowed to opt into this action, pursuant to § 216(b) of the FLSA.

## II. PARTIES

18.     Plaintiff Kathleen R. Faber was an employee of McDonald's and MBM and worked as a nighttime manager at the McDonald's restaurant at 200 North Main Street in Haysville, Kansas. Ms. Faber is an individual resident of Wichita, Kansas, and a citizen of Kansas. During all relevant times, Ms. Faber was the mother of an infant whom she breastfed and continued to breastfeed while she was working for Defendants. Pursuant to § 216(b), she has consented in writing to be a party to this action. Her executed Consent to Join form is filed herewith.

19.     Plaintiff Lexis Mays is an employee of McDonald's and Mac-Clark and who works as a manager at the McDonald's restaurant at 37 Meadow Street in Clinton, New York. Ms. Mays is an individual resident of Vernon, New York, and a citizen of New York. During all relevant times, Ms. Mays was the mother of an infant whom she breastfed and continued to breastfeed while she was working for Defendants. Pursuant to § 216(b), she has consented in writing to be a party to this action. Her executed Consent to Join form is filed herewith.

20.     The members of the McDonald's Collective and McDonald's Franchisee Collective, including Plaintiffs, are, or have been, employed by Defendants since December 29, 2022, and have requested lactation accommodation. Upon information and belief, Defendants' practices and policies, or lack thereof, have impacted members of the McDonald's Collective and McDonald's Franchisee Collective in the same or a similar manner across Defendants' locations.

21.     Defendant McDonald's U.S.A., LLC is a multinational, multibillion dollar Delaware limited liability company with its principal place of business at 110 North Carpenter

Street in Chicago, Illinois. McDonald's U.S.A., LLC is a wholly owned subsidiary of McDonald's Corp. that develops, operates, franchises, and services the McDonald's System of restaurants. McDonald's U.S.A., LLC is wholly owned by McDonald's Corp., a citizen of the state of Illinois. Therefore, McDonald's U.S.A., LLC is a citizen of Illinois. As of December 31, 2022, there were 40,275 McDonald's-branded restaurants worldwide with 13,444 in the U.S.; 693 of those restaurants are owned and operated by McDonald's U.S.A., LLC and 12,751 by franchisees. *Id.* In 2022, in U.S.-based restaurants, 57% of all staff were female with 70% of managers being female. *Id.*

22.     Defendant MBM Management, Inc. ("MBM") is a Michigan corporation that, upon information and belief, is owned and operated by an individual Alyssa Moten. MBM's principal office in Kansas is located at 550 North 159th Street. E. Suite 303 in Wichita, Kansas. Defendant MBM is a citizen of the State of Michigan.  Defendant MBM Management, Inc. is the owner and operator of the McDonald's franchise restaurant at which Plaintiff Kathleen Faber worked at all relevant times herein.

23.     Defendant Mac-Clark is a New York corporation that, upon information and belief, is owned and operated by Harold T. Clark Jr. Mac Clark's principal office in New York is located at 185 Genesee Street, Suite 1505, Utica, New York. Defendant Mac-Clark is the owner and operator of the McDonald's franchise restaurant at which Plaintiff Lexis Mays worked at all relevant times herein.

24.     Defendants ABC Corporations 1–100 d/b/a McDonald's (the "ABC Corporations") are fictitiously named entities that represent the franchisees of the McDonald's Defendants and owners of McDonald's-branded restaurants throughout the United States at which members of the McDonald's Franchisee Collective worked at all relevant times herein.

25.     Defendants were "employers" within the meaning of the FLSA pursuant to 29 U.S.C. §§ 203(a), (d) and Defendants MBM and McDonald's were "employers" of Ms. Faber at all times relevant hereto, and Defendants Mac-Clark and McDonald's were "employers" of Ms. Mays at all relevant times hereto. At all times relevant and material herein, and as alleged further herein, McDonald's controlled the operations of its franchisees and, by extension, the employees, including the McDonald's Franchisee Defendants, and had a centralized "System" whereby the physical layout of the restaurants, policies, practices, and guidelines, including with respect to lactation accommodation, are created and disseminated to its franchise-owned and subsidiary-owned stores from its headquarters in Chicago.

### III. JURISDICTION AND VENUE

26.     This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States.

27.     This Court has personal jurisdiction over Defendants because Defendant McDonald's is headquartered in this District, transacts business in this District, and McDonald's has significant contacts in this District.

28.     This Court has jurisdiction over MBM, Mac-Clark, and ABC Corp. 1-100 because both these entities operate under the direct control and influence of McDonald's, which is headquartered in this District. Franchisees operate as part of an integrated corporate structure that includes a nationwide network under the McDonald's brand. Franchisees benefit from national marketing, supply chain, and operations support provided by McDonald's, an Illinois-based company. Further, MBM and Mac-Clark regularly communicate with McDonald's and have strict reporting requirements and compliance audits, which requires regularly sending materials to McDonald's headquarters. Further, franchisees — by entering into franchise agreements with

McDonald's, which includes a provision requiring franchisees to submit to personal jurisdiction in this District — purposefully avail themselves of the privilege of conducting business in the forum state, namely of that of the benefits and protections provided by their Illinois-based parent company. Upon information and belief, the General Managers of MBM, Mac-Clark, and ABC Corps. 1-100 were trained at Hamburger University, located in this District. In other words, franchisees like MBM and Mac-Clark engage in a continuous and systematic business relationship with this District by and through their business relationship with McDonald's.

29.     The injury complained of herein arose from Defendants MBM, Mac-Clark, and ABC Corps. 1-100 forum-related activities in that these particular Defendants were trained regarding business operations and were controlled in terms of their business operations, including any policies related to lactation accommodations (or lack thereof).

30.     The exercise of personal jurisdiction over Defendants MBM, Mac-Clark, and ABC Corps. 1-100 comports with traditional notions of fair play and substantial justice where these Defendants benefit from national marketing, supply chain, and operations support provided by McDonald's, an Illinois-based company. Further, franchisees regularly communicate with McDonald's and have strict reporting requirements and compliance audits, which requires regularly sending materials to McDonald's headquarters. And, by entering into franchise agreements with McDonald's, which includes a provision requiring franchisees to submit to personal jurisdiction in this District, these Defendants purposefully avail themselves of the privilege of conducting business in the forum state.

31.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this District, and Defendants are subject to personal jurisdiction here. McDonald's headquarters is in this district

11

and with a centralized policy development and implementation stemming from headquarters, all key policies and procedures, including those related to policies and employee manuals that dictate the terms and conditions of employment and directly impact the availability of accommodations for nursing employees, originate from this District. Accordingly, a substantial part of the events or omissions giving rise to Plaintiffs' claim originated in this District.

## IV. <u>BACKGROUND</u>

### A.    *The Benefits of Breastfeeding*

32.    There are significant and proven benefits to breastfeeding children. Breast milk is widely accepted as the optimal source of nutrition for infants, and it provides numerous protections against illnesses and diseases for infants and mothers alike.

33.    Breastfed babies generally have better immune system development and functioning because breastmilk contains antibodies that protect developing immune systems from disease.[13] As a result, babies who are breastfed tend to have fewer and less severe instances of certain short-term illnesses, including bacterial meningitis, diarrhea, ear infections, respiratory infections, urinary tract infections, and certain chronic illnesses, including diabetes, lymphoma, leukemia, hypercholesterolemia, and asthma.[14]

---

[13] *See* Spitzmeuller, C.*,* Wange, Z., Zhang, J., Thomas, C.L., Fisher, G.G., Matthews, R.A., and Strathearn, L. (2016). *Got milk? Workplace factors related to breastfeeding among working mothers*, Journal of Organizational Behavior, J. Organiz. Behav. 37, 692–718; Grummer-Strawn, L.M. and Rollins, N. (2015), Summarising the health effects of breastfeeding. Acta Paediatr, 104: 1-2. https://doi.org/10.1111/apa.13136 (last accessed July 8, 2024).

[14] *See Guide for Establishing a Federal Nursing Mother's Program, supra,* n. 4, at 6–7.

34. A paper published in 2015, analyzing dozens of studies, found that breastfeeding is associated with a lower risk of childhood obesity. The paper states that breastfeeding was associated with a significantly reduced risk of obesity in children.[15]

35. Several studies have found that breastfeeding is associated with a lower risk of sudden infant death syndrome ("SIDS"). These studies show that babies who were breastfed for the first few months of life had a lower risk of SIDS than babies who were not breastfed.[16]

36. The World Health Organization recommends that infants be exclusively breastfed for the first six months of life, meaning they should receive no other food or drink, not even water.[17]

37. Although breastfeeding initiation and duration have consistently improved, one study revealed that 60% of women do not meet their breastfeeding goals.[18]

---

[15] Horta, B.L., Loret de Mola, C. and Victora, C.G., *Long-term consequences of breastfeeding on cholesterol, obesity, systolic blood pressure and type 2 diabetes: a systematic review and meta-analysis.* Acta Paediatr, (2015) 104: 30-37; *see also* Yan J., Liu L., Zhu Y., Huang G., Wang P.P., *The association between breastfeeding and childhood obesity: a meta-analysis.* BMC Public Health. 2014, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4301835/ (last accessed July 8, 2024).

[16] Meek, J. Y., Noble, L. *Technical Report: Breastfeeding and the Use of Human Milk.* Pediatrics July 2022; 150 (1): e2022057989, at 7. Available at: https://publications.aap.org/pediatrics/article/150/1/e2022057989/188348/Technical-Report-Breastfeeding-and-the-Use-of?searchresult=1?autologincheck=redirected (last accessed July 8, 2024).

[17] *World Health Organization's (WHO) Global Strategy for Infant and Young Child Feeding*, at 7–8. Available at: https://www.who.int/publications/i/item/9241562218 (last accessed July 8, 2024).

[18] Odom E. C., Li R., Scanlon K. S., Perrine C. G., Grummer-Strawn L., *Reasons for earlier than desired cessation of breastfeeding.* Pediatrics (2013); 131:e726–e732, e729.

38.     Society also benefits from breastfeeding. One study showed that if 90% of women in the United States breastfed exclusively for six months, it would save the country $13 billion and prevent 911 preventable infant deaths per year.[19]

39.     As discussed, the benefits of breastfeeding are significant, but there are also drawbacks to not breastfeeding. Parents who do not breastfeed suffer heightened health risks "including breast and ovarian cancers, heart disease, postpartum depression, diabetes, and rheumatoid arthritis."[20]

## B.     *Proper Workplace Accommodations for Pumping Are Critical*

40.     Not having a secure space for nursing mothers can increase anxiety and feelings of being overwhelmed, which can have a negative impact on the mother's mental, physical, and emotional health. Nursing mothers who do not have adequate workplace support are at an increased risk of early weaning, illness, and job loss. Therefore, it is critical for workplaces to provide support for nursing mothers.

41.     In 2011, the U.S. Surgeon General released a Call to Action to Support Breastfeeding and noted that for employed mothers, "returning to work is a significant barrier to breastfeeding" because nursing mothers often face inflexibility and, among other things, lack a private place to express milk.[21] The Call to Action found that when mothers "do not have a place

---

[19] Morris, L., Lee, J., Williams, J., *Exposed: Discrimination Against Breastfeeding Workers*. WorkLife Law, at 7. Available at: https://worklifelaw.org/publication/exposed-discrimination-against-breastfeeding-workers/ (last accessed on July 8, 2024) (citing Bartick, M. L., & Reinhold, J. *The economic burden of suboptimal breastfeeding in the United States: a systematic review*. Pediatrics (2010); 126(3), e756–e768).

[20] *Id.*, at 7, citing Am. Acad. of Pediatrics, Policy Statement, *Breastfeeding and the Use of Human Milk*, 129 PEDIATRICS e827, 32 (2012).

[21] *The Surgeon General's Call to Action to Support Breastfeeding, Barriers to Breastfeeding in the United States*, Office of the Surgeon General (US); 2011. Available at https://www.ncbi.nlm.nih.gov/books/NBK52682/ (last accessed July 8, 2024).

to breastfeed or express breast milk, they may resort to using the restroom for these purposes, an approach that is unhygienic and associated with premature weaning."[22]

42.     A study based on data from 2011 to 2013, after the Pumping at Work Act was enacted in 2010, found that workplace accommodations are a significant predictor of breastfeeding duration.[23] The study found that nearly 50% of women reported that their postpartum employment plans affected breastfeeding-related decisions.[24] About a third of women indicated that employment posed a challenge to breastfeeding, and only 45% of women had access to a private space to pump milk.[25]

43.     A clean and secure lactation space is necessary for a mother to pump milk comfortably and efficiently.[26] Without a clean, secure space, nursing mothers can experience anxiety and stress, which can negatively impact the mother's milk supply.

44.      The more a mother gets to pump her breast milk, the longer her milk supply/production lasts and the more breast milk the baby gets. Continuous pumping increases the chances of a longer supply of breastmilk.[27] Conversely, being unable to express milk when needed

---

[22] *Id.*

[23] Kozhimannil, K. B., Jou, J., Gjerdingen, D. K., and McGovern, P. M., *Access to workplace accommodations to support breastfeeding after passage of the Affordable Care Act*, Women's Health Issues. 2016; 26(1): 6–13.

[24] *Id.*, at 8.

[25] *Id.*

[26] *See* Whitley M.D., Ro A., Choi B. *Workplace breastfeeding support and job satisfaction among working mothers in the United States*. Am J Ind Med. 2019; 62(8):716–726, 717. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8423352/ (last accessed July 8, 2024).

[27] *See* Bai Y., Wunderlich S.M. *Lactation accommodation in the workplace and duration of exclusive breastfeeding*. J Midwifery Womens Health. 2013; 58(6): 690–96, 697 and 695.

can result in a decrease in the individual's milk supply, forcing an earlier-than-recommended weaning of the child.[28]

45.     When a mother's milk empties, there are neurological signals that release a hormone called prolactin, which triggers milk production. Limiting the amount a mother can pump decreases the amount of emptying and, therefore, decreases milk production.

46.     Limiting the amount a person can pump can also lead to mastitis, an inflammation of the breast tissue that may involve infection, abscess, pain, fever, and illness.[29] Mastitis can increase the risk of premature weaning.[30] Even if women do not develop mastitis or other complications from engorgement, pumping while already engorged can cause nipple trauma and bruising. Additionally, inadequate pumping can reduce a mother's milk supply, and it can take much longer to bring the supply back up.[31]

47.     Moreover, a recent systematic review of studies on maternal mental health and breastfeeding showed that mothers who were not able to achieve their breastfeeding goals had negative mental health outcomes and put them at greater risk for depression, anxiety, and other mental health conditions.[32] Having proper workplace accommodations, like a clean and secure place to pump milk, can help nursing mothers achieve their breastfeeding goals and minimize the

---

[28] *See The Surgeon General's Call to Action to Support Breastfeeding, supra* n. 25.

[29] *Exposed: Discrimination Against Breastfeeding Workers*, s*upra* n. 5 at 7, citing Lisa Amir. & The Academy of Breastfeeding Medicine Protocol Committee, ABM Clinical Protocol #4: Mastitis, Breastfeeding Medicine, 9 (5), 239 (Revised March 2014).

[30] *See The Surgeon General's Call to Action to Support Breastfeeding, supra* n. 25.

[31] *Id.*

[32] Yuen M., Hall O.J., Masters G.A., Nephew B.C., Carr C., Leung K., Griffen A., McIntyre L., Byatt N., Moore Simas T.A. *The Effects of Breastfeeding on Maternal Mental Health: A Systematic Review*. J Womens Health (Larchmt). 31(6): 787–807, available at: https://pubmed.ncbi.nlm.nih.gov/35442804/ (last accessed July 8, 2024).

risk of maternal mental health problems, such as depression and anxiety. Nursing mothers who had access to supportive workplace accommodations can feel more confident and supported in the breastfeeding experience, which can play an important role in maternal mental health.[33]

### C.    Employers Must Do More to Protect Breastfeeding Employees

48.    Failing to provide adequate lactation accommodations remains a prevalent issue and can often force nursing mothers to stop breastfeeding or leave the workplace altogether.

49.    A report published in 2016 by the Center for WorkLife Law at the UC Hastings College of the Law found that cases where an employer denied accommodations to or discriminated against an employee because she was breastfeeding or needed to express milk during the workday increased 800% between 2005 and 2016.[34]

50.    According to a report released in 2019, which tracked 70 cases involving allegations of breastfeeding discrimination and retaliation that have written opinions issued between 2008 and April 2018, 63% of employees ended up losing their job (43% were fired and 20% resigned).[35]

51.    The women facing job loss for lack of lactation accommodation spanned from a taqueria cashier in California to a doctor in Georgia and a lawyer in New York.[36]

---

[33] *See The Surgeon General's Call to Action to Support Breastfeeding, supra* n. 24.

[34] Calvert, C. T., *Caregivers in the Workplace: FRD Update 2016*. Center for WorkLife Law at the UC Hastings College of the Law, at 17. Available at: https://worklifelaw.org/publications/Caregivers-in-the-Workplace-FRD-update-2016.pdf (last accessed July 8, 2024).

[35] *Exposed: Discrimination Against Breastfeeding Workers, supra* n. 23, at 13.

[36] *Id.* citing *Dep't of Fair Employment & Hous. v. Acosta Tacos*, No. E200708 T-0097-00se, 2009 CAFEHC LEXIS 2, at *8–10 (Cal. Fair Employment & Hous. Comm'n June 16, 2009); *Wexler v. Kennesaw Pediatrics, P.C.*, No. 16-cv-1491, 2017 U.S. Dist. LEXIS 111037, at *2–3 (N.D. Ga. July 17, 2017); *Kim v. Goldberg*, 862 F. Supp. 2d 311, 315 (S.D.N.Y. 2012).

52.     For example, in 2019, Simone Teagle filed a lawsuit against the City of New York for the discrimination she experienced as a breastfeeding mother.[37] Teagle said that for nearly six months, she was forced to pump in a breakroom, a bathroom, the locker room, or her vehicle.[38] As a result, she "lost a lot of her milk supply."[39] The suit is still pending.

### D.     *The Law Before the PUMP Act*

53.     Despite this wide consensus in favor of pumping, and Congress having passed the Pumping at Work Act in 2010, for the past 12 years, a common problem faced by all nursing mothers who were not provided with sufficient lactation accommodation was the weak enforcement mechanism under the Pumping at Work Act. With limited remedies available, many of the claims in these cases based on violations of the Pumping at Work Act were dismissed.

54.     Under § 207(r) of the Pumping at Work Act, the only remedies available were for unpaid minimum wages or overtime compensation. However, because employers are not required to pay employees who take breaks to pump, holding accountable employers who failed to provide

---

[37] *See Teagle et al. v. The City of New York et* al., No. 19-cv-7211 (E.D.N.Y); *see also* H.R. 3110, 117th Cong. (1st Sess. 2021), at 16.

[38] *See NYPD Cop Sues City for $5 Million Amid Claims She Was Harassed for Pumping Breast Milk*, (October 18, 2018). Available at: https://news.yahoo.com/nypd-cop-sues-city-5-155315818.html (last accessed July 8, 2024).

[39] *Exposed: Discrimination Against Breastfeeding Workers, supra* n. 23, at 12.

accommodations was virtually impossible.[40] As one court noted, with regards to the Pumping at Work Act, "there does not appear to be a manner of enforcing the express breast milk provisions."[41]

55.     Without a proper enforcement mechanism, employers like Defendants were permitted to, and did, freely violate the Pumping at Work Act with little fear of consequence.

56.     Ensuring that working mothers have the time and space to express breastmilk is not a partisan issue. Around the time that the PUMP Act was passed, politicians from across the political spectrum expressed support for strengthening protections for lactating mothers in the workplace.

57.     In a statement issued on March 8, 2021, in recognition of International Women's Day, President Biden said: "We must ensure that women can access affordable, high-quality health care throughout their lives, including maternal health care and the ability to breastfeed."[42]

58.     Thereafter, in October 2021, Congresswomen Jaime Herrera Beutler, a Republican Congresswoman from Washington, expressed her support for the PUMP Act, stating:

> Making sure moms can pump at work promotes healthier families, and it's also important to help businesses recruit and retain the workforces they need. That's why I'm pleased the House approved this business-friendly, bipartisan legislation … that simply provides moms with reasonable opportunities to pump in their workplace. I'm

---

[40] In one of a handful of cases in which the court permitted a § 207(r) claim to proceed, a postpartum bank teller was told she had to express milk in the bathroom. When she objected on the basis that the bathroom was unsanitary, she was eventually forced to leave work in the middle of the day to go home and pump. She sued her employer, and the court only permitted the suit to proceed because it found the plaintiff had alleged 40.35 hours of lost wages. The case was settled in 2017. *Lico v. TD Bank,* No. 14-cv-4729, 2015 U.S. Dist. LEXIS 70978 (E.D.N.Y., 2015).

[41] *Salz v. Casey's Marketing Co.*, No. 11-cv-3055, 2012 U.S. Dist. LEXIS 100399, at *7 (N.D. Iowa July 19, 2012).

[42] https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/08/statement-by-president-biden-on-international-womens-day/ (last accessed July 8, 2024).

proud to have worked with businesses, health care stakeholders, and parents in successfully leading this legislation [].[43]

59.    On September 27, 2021, the White House issued a statement strongly supporting the PUMP Act, stating that: No new mother should face unfair treatment in the workplace because their employer refuses to provide them with [a] . . . private, clean space needed to adequately express breast milk while at work, forcing them to choose between their health and the health of her child, and earning a paycheck. Yet millions of new working mothers, disproportionately working mothers of color, face this challenge every day.[44]

60.    Prior to the vote on the PUMP Act, Republican Senator Lisa Murkowski stated: "With this bill, parents will be empowered to make their own choices on breastfeeding, and businesses can improve retention of valuable employees. It's a win-win-win . . . What has been a question is a women's protection at the jobsite to pump safely. If a mother chooses to breastfeed her baby, she deserves the legal protection to do so without having to worry about it impacting her career."[45]

61.    Numerous organizations outside of government also expressed strong support for the PUMP Act. For example, in a news release published on October 22, 2021, on the U.S. Breastfeeding Committee's website, Vania Leveille, Senior Legislative Counsel for the ACLU, said: "Employers in every industry should have policies in place to accommodate the needs of pregnant and breastfeeding employees but, unfortunately, that is not currently the case. Instead,

---

[43] https://adams.house.gov/media-center/press-releases/adams-maloney-congressional-maternity-care-caucus-black-maternal-0 (last accessed July 8, 2024).

[44] https://www.whitehouse.gov/wp-content/uploads/2021/09/H.R.-3110-SAP.pdf (last accessed July 8, 2024).

[45] https://www.newsweek.com/full-list-senators-who-voted-against-breastfeeding-workers-protections-1769450 (last accessed July 8, 2024).

too many workers are penalized, discriminated against, terminated, or left without options when they try to pump breast milk at work."[46]

62.    On the other hand, organizations that represent businesses also saw the value in passing the PUMP Act. The National Retail Federation's Senior Vice President for Government Relations told the Members of the House in a letter dated October 12, 2021, that "[t]he PUMP Act is a sound piece of bipartisan legislation that will allow nursing mothers to maintain their vital role the American workplace."[47]

63.    Similarly, in a letter sent to all the Members of Congress, the U.S. Chamber of Commerce, stated: "The PUMP Act is a win-win for nursing mothers and the businesses that employ them. Employers would get clarity and a way to avoid litigation, and nursing mothers would be able to remain in the workforce. The Chamber is pleased to strongly support this legislation."[48]

64.    Indeed, private industry also recognizes and supports the increasing need to protect and accommodate nursing mothers. There is a growing industry for the sale of "portable lactation pods," which are specially designed private spaces available to be used in various public and private venues to support breastfeeding mothers.[49] These pods are intended to address the need for

---

[46] https://www.usbreastfeeding.org/usbc-news--blogs/pump-for-nursing-mothers-act-passes-with-bipartisan-support-in-us-house-of-representatives (last accessed July 8, 2024).

[47] Letter from David French to the Honorable Nancy Pelosi (Oct. 12, 2021) *available at* http://d22f3d5c92fe72fd8ca1-d54e62f2f7fc3e2ff1881e7f0cef284e.r22.cf1.rackcdn.com/2021%20Hill%20Letters/NRF%20Support%20Letter%20-%20PUMP%20Act%20-%20October%2012%202021.pdf (last accessed November 8, 2023).

[48] *U.S. Chamber Letter on the PUMP Act* (Dec. 20, 2022) *available at* https://www.uschamber.com/employment-law/u-s-chamber-letter-on-the-pump-act (last accessed July 8, 2024).

[49] For example, Mamava Inc., BrighterBooth, Nessel, and Panel Built Inc. all market and sell portable, free-standing, and/or prefabricated lactation spaces.

access to adequate space for breastfeeding, away from public spaces or unhygienic restrooms. The growing presence of these lactation pods in the United States highlights a societal effort to recognize the importance of the well-being of both new mothers and infants.

### E. The PUMP Act

65. Given the acknowledged problems with the Pumping at Work Act, in late 2022, Congress passed the PUMP Act with strong bi-partisan majorities in both houses. In the House of Representatives, it passed with a 276-member majority,[50] and in the Senate, it passed with a near-unanimous vote of 92 to 5.[51]

66. On December 29, 2022, the President signed an omnibus spending bill (P.L. 117-58), which included the PUMP Act.

67. According to both the House bill (H.R. 3110)[52] and the relevant Senate Amendment (S. Amdt. 6595),[53] the purpose of the PUMP Act was "[t]o amend the [FLSA] to expand access to breastfeeding accommodations in the workplace, and for other purposes."

68. Specifically, the PUMP Act amended the FLSA to include § 218d, which provides that:

> (a) An employer shall provide —
>
> ''(1) a reasonable break time for an employee to express breast milk for such employee's nursing child for 1 year after the child's birth each time such employee has need to express the milk; and

---

[50] https://clerk.house.gov/Votes/2021331?BillNum=3110 (last accessed July 8, 2024).

[51] https://www.senate.gov/legislative/LIS/roll_call_votes/vote1172/vote_117_2_00417.htm (last accessed July 8, 2024).

[52] https://www.congress.gov/bill/117th-congress/house-bill/3110/text (last accessed July 8, 2024).

[53] https://www.congress.gov/amendment/117th-congress/senate-amendment/6595 (last accessed July 8, 2024).

''(2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

29 U.S.C. § 218d.

69.    Notably, the statute states that the "employer *shall* . . . provide a place…" for nursing parents to express milk. (Emphasis added.) The word "shall" in § 218d imposes an affirmative duty on the employer to provide a clean, secure space because, as Congress found, "[a] private space to express breast milk is critical for nursing employees."[54]

70.    Notably, the PUMP Act also strengthened the relief available by inserting specific language in § 216(b) (one of the enforcement sections of the FLSA) stating that:

> Any employer who violates the provisions of section 15(a)(3) *or 18D of this Act* [29 USCS § 215(a)(3) or 218d] *shall be liable for such legal or equitable relief as may be appropriate* to effectuate the purposes of section 15(a)(3) or 18D [29 USCS § 215(a)(3) *or 218d*], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

29 U.S.C. § 216(b) (emphasis added, which reflects the amendments to § 216(b)).

71.    Congress intended this addition to correct for the lack of enforcement provided for in the Pumping at Work Act. According to the legislative intent behind the PUMP Act, one of the purposes was to provide additional forms of relief:

> …recovery only for unpaid minimum wages or overtime compensation renders employees unable to enforce current break time and space requirements in a private right of action…even if unpaid minimum wage or overtime compensation were recoverable, lost wages are often an inadequate or inappropriate form of relief… H.R. 3110 would allow workers to seek legal *and equitable relief*… Allowing for legal and equitable relief under H.R. 3110 will also *allow nursing employees to recover for harm to their physical and*

---

[54] H.R. 3110, 117th Cong. (1st Sess. 2021), at 10.

23

> *mental health…including for medical costs or emotional distress, and punitive damages for this type of harm*.[55]

F.      **Guidance from the Department of Labor**

72.      On May 17, 2023, The U.S. Department of Labor Wage and Hour Division ("WHD") published Field Assistance Bulletin No. 2023-02 (the "FAB"), which provides guidance to agency officials responsible for enforcing the PUMP Act.[56] The FAB provides insight into how the WHD will enforce employees' rights under the PUMP Act.

73.      Regarding an employee's right to breaks to pump breast milk, the FAB emphasizes that employees are entitled to a "reasonable break *each time* such employee has need to pump breast milk at work for one year after the child's birth. An employer may not deny a covered employee a needed break to pump."[57]

74.      Regarding the space requirements, employers must provide a "functional space" that is "(1) shielded from view; (2) free from intrusion from coworkers and the public; (3) available each time it is needed by the employee; *and* (4) not a bathroom."[58]

75.      The FAB states: The location *must be functional as a space for pumping*.[59] It must have a place for the nursing employee to sit, a flat surface (other than the floor), and employees must be able to store milk while at work.[60]

---

[55] H.R. 3110, 117th Cong. (1st Sess. 2021), at 16 (emphasis added).

[56] U.S. Department of Labor, Wage and Hour Division, Field Assistance Bulletin No. 2023-02. Available at: https://www.dol.gov/sites/dolgov/files/WHD/fab/2023-2.pdf (last accessed July 8, 2024).

[57] *Id.* at 2 (emphasis in original).

[58] *Id.* at 4 (emphasis in original).

[59] *Id.* (emphasis added).

[60] *Id.*

76.     Further, an employer who violates a nursing mother's right to reasonable break times and a functional space to pump breast milk is liable "for appropriate legal or equitable remedies . . . . [which] may include **compensatory damages and make-whole relief**, such as economic losses that resulted from violations, **and punitive damages** where appropriate. These remedies are available regardless of whether the employee has also experienced retaliation."[61]

77.     An employee may file a private cause of action seeking appropriate remedies, and there is "**no waiting time**" for an employee bringing a private suit "to enforce the reasonable break time requirement."[62]

78.     Finally, employers are required to "post and keep posted a notice explaining the FLSA [and PUMP Act provisions] in conspicuous places in every establishment where such employees are employed."[63]

79.     On September 18, 2023, the Department of Labor's Wage and Hour Division found "supervisors employed by Aimbridge Employee Service Corp. — operating as Hammock Beach Golf Resort and Spa — failed to provide a private place for a worker to express milk for her newborn baby, in violation of" the PUMP Act.[64] The agency found that it took supervisors nearly four months to provide an employee with a suitable space to pump milk, and even then the space — a manager's office — lacked privacy as the employee learned "when another worker entered the room while the mother was attempting to pump milk."

---

[61] *Id.* at 7 (emphasis added).

[62] *Id.* at 8 (emphasis in original).

[63] *Id.*

[64] *U.S. Department of Labor Finds Palm Coast Resort Operator Denied Employee Private Space to Express Milk for Newborn, As Federal Law Requires*. Available at: https://www.dol.gov/newsroom/releases/whd/whd20230918 (last accessed July 8, 2024).

80.     Division Director Wildalí De Jesús stated: Employers who fail to provide break time and a private place as the law requires are creating a barrier for women to balance their career and a child's needs once they return to work after having a child."[65] "There are long term benefits to breast feeding both for families and employers. Mothers who breast feed generally take less time off work due to childhood illnesses," added De Jesús.

81.     Plaintiffs seek this Court's assistance on behalf of all nursing mothers who work and their infant children to improve breastfeeding outcomes by making clear that employers cannot deny their employees adequate lactation accommodation in the workplace.

## V. DEFENDANTS DENY PLAINTIFFS AND SIMILARLY SITUATED EMPLOYEES THEIR RIGHTS TO ACCOMMODATION

82.     Plaintiff Faber began working for MBM and McDonald's in January 2023 as a night manager of the McDonald's at 200 North Main Street in Haysville, Kansas.

83.     In September 2022, Ms. Faber gave birth to her child. She began her job at the McDonald's-branded restaurant in January 2023. At that time, she informed the General Manager, "Karent," that she was a breastfeeding mother who would need breaks and a place to pump. Karent assured Ms. Faber that it would not be a problem and that she should have lots of time to pump during the night shift. However, when Ms. Faber began working, Defendants MBM and McDonald's did not accommodate her request to pump breast milk at work.

84.     When Ms. Faber inquired as to where she should pump, Ms. Faber was told that she would have to pump in the stock room or the bathroom. As night manager, Ms. Faber generally worked with only one or two other employees. On nights that Faber worked with a female employee, she pumped in the corner of the stock room that was not within the sight lines of the security cameras. When Faber worked with a male employee, she pumped in the bathroom.

---

[65] *Id.*

85.    Throughout the relevant period, management at the restaurant was made aware that Ms. Faber was pumping in the stockroom and bathroom. Ms. Faber specifically advised her immediate supervisor, Patricia Rivera, that she was pumping in the bathroom. Ms. Faber expressed to both Ms. Rivera and Karent that the bathroom was an unsuitable place to pump. They responded by indicating that there was no other private place in the restaurant to pump. Thus, Defendants MBM and McDonald's refused to make any accommodation or efforts to create a space or designate a room in which Ms. Faber could securely and sanitarily pump. Defendants MBM and McDonald's could have set up a temporary pumping space for Ms. Faber but chose not to.

86.    Defendants MBM and McDonald's also failed to provide Ms. Faber with breaks each time she needed to pump. During approximately half of her shifts, she had no break and could not pump at all. This caused her to experience engorgement, which was uncomfortable and painful. Eventually, in late April or early May 2023, Ms. Faber switched to part-time but had to quit at the end of May 2023 due, in large part, to the lack of lactation accommodation.

87.    Defendants' MBM and McDonald's lack of pumping accommodation impacted Ms. Faber both physically and mentally. She experienced a reduction in her milk supply as a result of not being able to pump each time she needed. Prior to working at the McDonald's restaurant, Ms. Faber was overproducing milk. However, as she continued working, her supply began to noticeably drop off, With each passing week, she produced less milk and had to supplement with formula. Ms. Faber also felt stressed and anxious at work because she was constantly worried about whether she could pump and, if so, where she could go to pump. Ms. Faber also felt guilty about not being able to provide her daughter with enough breast milk.

88.    Defendants MBM and McDonald's did not provide Ms. Faber with sufficient break times "each time" she needed to pump. For example, MBM and McDonald's Defendants could

have re-arranged staffing for the limited time while Ms. Faber was pumping to ensure adequate coverage to allow Ms. Faber to take pumping breaks, but they chose not to. Nor did those supervisors provide Ms. Faber with a "functional space" to express breast milk. Again, MBM and McDonald's Defendants could have set up a temporary pumping space for Ms. Faber but chose not to. In all these ways, MBM and McDonald's Defendants violated the PUMP Act with regard to Ms. Faber.

89.    Thus, MBM and McDonald's Defendants, on information and belief pursuant to organization-wide policies (or lack thereof), did not provide Ms. Faber with sufficient break times "each time" she needed to pump. Nor did they provide her with a functional, sanitary, and private space to pump. Defendants' MBM and McDonald's' acts violate the PUMP Act.

90.    Plaintiff Lexis Mays worked for Defendants Mac-Clark and McDonald's at the McDonald's-branded restaurant located at 37 Meadow Street in Clinton, New York.

91.    Ms. Mays started working at the McDonald's-branded restaurant as a crew member in May 2019, and in July 2020 became a manager. She had her child in January 2023 and returned to work the last week of February 2023. Ms. Mays informed the HR manager, Joe Adamczyk, and her manager, Kathy Flemming, that she would return and be breastfeeding and would have pumping equipment with her at work. Her supervisors assured Ms. Mays that she would have time to pump; however, Defendants Mac-Clark and McDonald's did not accommodate her request to pump breast milk at work.

92.    Upon returning to work, Ms. Mays was told to pump in the back office, which does not have a door and is open to the rest of the crew members. Ms. Mays advised her supervisors that there was no secure place to pump, and they responded that no private space was available. As a result, Ms. Mays continued to pump in the open office for several months. Several crew

28

members came into the office every time she pumped, while others would walk by with Ms. Mays in plain sight.

93.     Defendants Mac-Clark and McDonald's also failed to provide Ms. Mays with breaks each time she needed to pump. Ms. Mays gets one unpaid 30-minute lunch break that she would use to pump and would have to find other times to pump during her shift. While Ms. Mays tried to pump once or twice each shift, there were times when Mays was the only manager on duty and could not take breaks to pump. Defendants Mac-Clark and McDonald's could have re-organized their employee shifts to accommodate Ms. Mays' need to take breaks to pump, but they chose not to.

94.     Defendants' Mac-Clark and McDonald's' lack of pumping accommodation impacted Ms. Mays both physically and mentally. She experienced a reduction in her milk supply because of not being able to pump each time she needed to. Ms. Mays also felt stressed and anxious at work because she was constantly worried about whether she could pump and pumping out in the open where other employees would walk by took an emotional toll on her.

95.     Defendants Mac-Clark and McDonald's, pursuant to organization-wide policies (or lack thereof), did not provide Ms. Mays with sufficient break times "each time" they needed to pump. For example, Defendants Mac-Clark and McDonald's could have re-arranged staffing for the limited time while Ms. Mays was pumping to ensure adequate coverage to allow Ms. Mays to take pumping breaks, but they chose not to. Nor did those supervisors provide Ms. Mays with a "functional space" to express breast milk. Again, Defendants Mac-Clark and McDonald's could have set up a temporary pumping space for Ms. Mays but chose not to. In all these ways, Defendants Mac-Clark and McDonald's violated the PUMP Act with regard to Ms. Mays.

96.     Thus, MBM and McDonald's Defendants, on information and belief pursuant to organization-wide policies (or lack thereof), did not provide Ms. Faber with sufficient break times "each time" she needed to pump. Nor did they provide her with a functional, sanitary, and private space to pump. Defendants' MBM and McDonald's' acts violate the PUMP Act.

97.     Upon information and belief, pursuant to organization-wide policies (or lack thereof), ABC Corporations 1–100 failed to provide their employees with sufficient break times "each time" they needed to pump.

98.     Upon information and belief, again pursuant to organization-wide policies (or lack thereof), ABC Corporations 1–100 also failed to provide their employees with functional, sanitary, and private spaces to pump.

99.     Upon information and belief, the foregoing policies (or lack thereof) were created, coordinated, and/or managed by employees and executives of McDonald's Defendants. The McDonald's Defendants' actions regarding the franchisees were accomplished through various means, including but not limited to contractual clauses giving McDonald's Defendants control over the franchisees' operations, including aspects of staffing and hours of operation; the physical layout of restaurants as well as the size and dimensions of rooms and facilities in the "front" and "back" of McDonald's-branded restaurants; companywide policies or decisions (or a lack thereof) regarding lactation accommodation; regular field visits to franchise locations to coordinate and enforce compliance with uniform operational standards and systems. McDonald's Defendants also failed to adequately train franchisee owners and managers regarding the rights of nursing employees.

100.    The foregoing acts of ABC Corporations 1–100 violate the PUMP Act.

101.    In accordance with 29 C.F.R. § 516.4, Defendants should have alerted nursing employees like Ms. Faber and Ms. Mays of their rights to sufficient lactation accommodation by posting information in conspicuous locations at McDonald's restaurants across the country. Upon information and belief, Defendants did not make such information available and failed to ensure that employees were aware of their rights to take reasonable breaks and to have a secure place to pump.

102.    As Plaintiffs' experiences show, in practice Defendants do not provide accommodations for nursing mothers. Defendants do not have an adequate or specific method or policy regarding secure, private, functional spaces for nursing mothers that they enforce at their locations. Defendants' failure to provide accommodations for nursing mothers violates the law. The FLSA requires employers to provide reasonable accommodations for nursing mothers, such as break times and a private place to pump breast milk. Defendants' refusal to do so denies nursing mothers their legal rights, makes it difficult for them to continue working while breastfeeding, and has impacted them mentally and physically.

103.    Defendants' failure to provide Ms. Faber, Ms. Mays, and other similarly situated employees with reasonable breaks and a secure space, shielded from view to express milk, caused them personal anguish, anxiety, and uncertainty about their ability to continue breastfeeding. Returning to work after having a baby and continuing to pump during working hours requires mothers to have stamina and persistence. It requires the upkeep of fluids and nutrition to ensure a continuous flow of milk production. Sufficient time and a functional space are necessary because to begin the flow of milk, mothers must be in a relaxed and rested state, not stressed and anxious while pumping in the bathroom or in their personal vehicles in the public parking lots, in plain view. The stress and anxiety of breastfeeding while being seen by the public or colleagues, and

31

fear of not having enough time to pump until empty, can jeopardize the flow of milk and may result in mothers not being able to express as quickly as someone who is relaxed and certain that they will not be intruded upon.[66]

104.    Ms. Faber and Ms. Mays were damaged in that they experienced embarrassment, personal anguish, personal hardship, anxiety, humiliation, and emotional distress.

## VI. COLLECTIVE ACTION ALLEGATIONS

105.    The "McDonald's Collective" consists of all persons who have been or currently are employed by McDonald's at a McDonald's restaurant across the country, since December 29, 2022, who were or are lactating in the year following the birth of the child.

106.    The "Franchisee Collective" consists of all persons who have been or currently are employed by the Franchisee Defendants at a restaurant owned or operated by the Franchisee Defendants since December 29, 2022, who were or are lactating in the year following the birth of the child.

107.    As of December 31, 2022, there were 13,444 McDonald's restaurants in the U.S., including 693 owned and operated by McDonald's and its subsidiaries and 12,751 owned and operated by franchisees. There are similarly situated employees who are working or worked at McDonald's-branded restaurants and are or were unlawfully denied their rights under the PUMP Act.

108.    The number of affected employees can be ascertained by Defendants based on their payroll and personnel records. Members of the Collectives may be informed of the pendency of

---

[66] *See* H.R. 3110, 117th Cong. (1st Sess. 2021), at 10 ("Breastfeeding mothers must feel safe in order to let down breast milk, and a reasonable guarantee of privacy is a key part of that safety. If a nursing mother feels unsafe or emotionally distressed, her production of oxytocin may be inhibited, which can create a physiological barrier to lactation." (citation omitted)).

this collective action by direct mail and/or publication at the various McDonald's-branded restaurants throughout the country.

109.  This action is properly maintained as a collective action under 29 U.S.C. § 216(b) because all class members are similarly situated. The affected individuals were and continue to be female employees working at McDonald's-branded restaurants who required accommodations for lactation at work from December 29, 2022, to the present and work or worked as employees at McDonald's restaurants.

110.  As mentioned above, companies such as Defendants can accommodate nursing employees by purchasing portable spaces, additional examples of which are shown below. These portable lactation pods are available at various prices and sizes and can be stored off-site. They are marketed to provide a secure, sanitary space with a flat surface to comfortably accommodate all nursing mothers. This is a widely available and simple solution for Defendants to accommodate their lactating employees.

 

111.  Defendants could also have accommodated their nursing employees by providing them with access to clean offices and by installing doors and locks to ensure they were secure. However, Defendants chose not to do so.

112.  Defendants failed to train or adequately inform their employees about the rights of nursing mothers to take reasonable breaks to pump and their rights to a secure, private, non-

bathroom space. Defendants failed to institute procedures or guidelines to ensure that nursing employees would be properly accommodated.

113.    Defendants' willful policies and practices denied and continue to deny members of the Collectives their rights under the PUMP Act. Defendants' actions were willful because the PUMP Act received substantial publicity at the time of its passage and thereafter. The legal obligation to provide nursing employees with reasonable breaks and secure spaces has been in effect since 2010. McDonald's has career employment attorneys and an in-house legal department whose job requires staying current with recent laws and regulations and their potential impact on McDonald's operations. Therefore, McDonald's knew or should have known about its obligation to provide lactation accommodations to its employees and through its strong oversight program should have informed all its franchisees of the same obligations.   Defendants had notice of their non-compliance and, by failing to act, willfully refused to provide sufficient accommodation. Similarly, the Franchisee Defendants knew or should have known about their obligation to provide lactation accommodations to their employees, either through monitoring and understanding their obligations as employers themselves, or through trainings and coordination provided by the McDonald's Defendants.

114.    Franchisees are required to operate restaurants in a uniform manner and to "[k]eep the Restaurant[s] constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System. . . ."[67]

115.    Indeed, in the McDonald's Franchise Agreements it states:

>    McDonald's operates a restaurant system ("McDonald's System").
>    The McDonald's System is a comprehensive system for the ongoing
>    development, operation, and maintenance of McDonald's restaurant

---

[67] *See* McDonald's Franchise Disclosure Document (2023), McDonald's Franchise Agreement, § 12(c).

locations . . . . The foundation of the McDonald's System and the essence of this Franchise is the ***adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System*** including, but not limited to . . . ***the use of only prescribed equipment and building layout and designs*** . . . and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation.[68]

116.    McDonald's Corp. claims that "[e]nsuring a workplace that is both safe and respectful is not a simple box-checking exercise. It is an ongoing process that requires continuous effort and improvement. Our approach involves understanding, training and a clear Company-wide commitment . . . ."[69]  Further, the Company claims "strives to foster safe working environments for crew . . . and frequently evaluate[s] the effectiveness of health and safety programs" by conducting "safety assessments" "annually across all McDonald's-brand restaurants to reinforce a culture of safety."[70] However, failing to provide lactation accommodations to nursing employees who repeatedly request it and forcing them to continue working while they pump in unsanitary spaces falls far short of creating a safe and comfortable environment for employees. Instead, it results in the unlawful denial of employees' rights under the PUMP Act.

## **FIRST COUNT**

**Violation of the FLSA and PUMP Act**
**[29 U.S.C. § 218d(a)(1)]**
**(Brought on Behalf of Plaintiffs and Members of the McDonald's Collective and the Franchisee Collectives)**

117.    Paragraph 1-116 is incorporated by reference as though fully set forth herein.

---

[68] *Id.,* § 1 (emphasis added).

[69]  McDonald's Purpose and Impact Summary Report 2019–2020 available at: https://corporate.mcdonalds.com/content/dam/sites/corp/nfl/pdf/55854_McDonalds-ESG-report_ADA_FINAL.pdf (last accessed February 12, 2024).

[70]  McDonald's Purpose and Impact Summary Report 2021–2022 available at: https://corporate.mcdonalds.com/content/dam/sites/corp/nfl/pdf/McDonalds_PurposeImpact_ProgressReport_2021_2022.pdf (last accessed February 12, 2024).

118.    Plaintiff and members of the McDonald's Collective and Franchisee Collective are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

119.    The FLSA, at 29 U.S.C. § 218d(a)(1), states that an "employer shall provide: (1) a reasonable break time for an employee to express breast milk for such employee's nursing child for 1 year after the child's birth each time such employee has need to express the milk . . . ."

120.    Throughout the relevant period, McDonald's exercised control, directly or indirectly, over the employees and operations of the Franchisee Defendants through its control over the specifications governing the physical space for the franchised restaurant and through its establishment, coordination, and training regarding employee and operational policies.

121.    McDonald's exercises significant control over the daily operations of its franchisees through detailed and mandatory operational standards. According to the most recent Franchise Disclosure Document for McDonald's U.S.A. LLC, "the McDonald's System is a comprehensive restaurant system... Which McDonald's may modify at any time at its discretion. You [the franchisee] must operate the restaurant in conformity with the entire McDonald's system at all times, including... uniformity of facilities and Service."[71] The standards outlined by McDonald's include employee training programs, customer service protocols, and health and safety guidelines, all of which are dictated by McDonald's and implemented at the franchise level.

122.    Franchisees "shall operate[] in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified."[72]

---

[71] McDonald's Franchise Disclosure Document.

[72] *Id.*, Franchise Agreement, § 1(d).

123.    Upon information and belief, however, the Franchise Defendants may make a written request to deviate from the Franchise Agreement (*see* Franchise Agreement Sec. 12(d)) and, therefore, could have sought relief from the uniform operating standards to make appropriate lactation accommodations to its employees.

124.    In addition, McDonald's requires franchisees adhered to comprehensive employment policies, disseminated through McDonald's training manuals that include hiring practices, employee evaluations, scheduling and legal compliance. McDonald's and the Franchisee Defendants share or co-determine operating hours. For example, the Franchise Agreement at Section 12(g) provides that franchisees must keep the hours specified in the referenced Manual and must maintain adequate staff. McDonald's conducts regular inspections and audits of franchisee locations to ensure compliance with its corporate standards, demonstrating McDonald's control over the work environment at franchisee-operated restaurants.

125.    As such, the Franchisee Defendants also could have provided their employees with lactation accommodations by seeking from McDonald's additional staffing or breaks beyond that specified in the Franchise Agreement or business manuals to allow for lactation accommodations for their employees.

126.    McDonald's entered a Franchise Agreement with Franchisee Defendants.[73] The Franchise agreement between McDonald's and its franchisees establish an integrated business model, where McDonald's benefits directly from the operations of its franchisees. McDonald's and its franchisees are economically interdependent. Franchisees pay fees to McDonald's and McDonald's provides marketing and branding, which are integral to the success of its franchisees. Franchisees are required to contribute to McDonald's national advertising. This symbiotic

---

[73] *See supra* n. 11.

relationship between McDonald's and its franchisees is dependent on profitability and the franchisees' compliance with McDonald's corporate policies. The standard Franchise Agreement, demonstrating the extent to which McDonald's controls the operations of its franchisees, states:

> McDonald's operates a restaurant system ("McDonald's System"). The McDonald's System is a comprehensive system for the ongoing development, operation and maintenance of McDonald's restaurant locations . . . including . . . designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications . . . . .
>
> The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to . . . the use of only prescribed equipment and building layout and designs . . . Compliance by Franchisee with the foregoing standards and policies . . . provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System. Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of Franchisee's McDonald's restaurant business, Franchisee's accountability for performance of the obligations contained in this Franchise, and Franchisee's adherence to the tenets of the McDonald's System constitute the essence of this Franchise.
>
> \*       \*       \*
>
> 4.      McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant. The business manuals contain detailed information including: (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies. Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time . . . .
>
> 12.     Franchisee acknowledges that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including .

38

. . uniformity of facilities and service. McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following:

  (a) Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed by McDonald's . . . and maintain the building, fixtures, equipment, signage, seating and decor, and parking area in a good, clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

  (b) Purchase kitchen fixtures, lighting, seating, signs, and other equipment in accordance with the equipment specifications and layout initially designated by McDonald's and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

  (c) Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

  (d) Franchisee shall not, without the prior written consent of McDonald's: (i) make any building design conversion or (ii) make any alterations, conversions, or additions to the building, equipment, or parking area;

  (e) Make repairs or replacements required: (i) because of damage or wear and tear or (ii) in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;
      . . .

  (g) Operate the Restaurant seven (7) days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenantable as a result of fire or other casualty), maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

\*     \*     \*

18.     The parties agree that the happening of any of the following events shall constitute a material breach of this Franchise and violate the essence of Franchisee's obligations and, without prejudice to any of its other rights or remedies at law or in equity, McDonald's, at its election, may terminate this Franchise upon the happening of any of the following events:

(a)     Franchisee shall fail to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System;

127.     Section 4 of the Franchise Agreement states that McDonald's provides its franchisees with business manuals that govern nearly every aspect of operating the business. Franchisees must "adopt and use exclusively" the materials in the manuals. Failure to do so can result in a material breach of the franchise agreement.

128.     The Franchise Agreement states that each restaurant must "comply with the entire McDonald's System" and that franchisees must "maintain the building, fixtures, equipment . . . in compliance with designated standards" that are prescribed by McDonald's. Further, the franchisee must "construct and equip" the building in accordance with the McDonald's System and cannot modify or make any additions or alterations to the building or the layout without approval of McDonald's. These franchise agreements form a cornerstone of the operational control and standardization that establish the joint employment relationship between McDonald's and its franchisees.

129.     Further, McDonald's exerts control over employment conditions by imposing standardized building and infrastructure requirements on the franchisees, which directly impacts the accommodations for nursing mothers. McDonald's serves as the landlord for their franchisees

40

and includes a lease agreement as part of the Franchise Agreement.[74] Under the terms of the Lease, McDonald's "will construct or have others construct or remodel or otherwise prepare the Premises for a McDonald's Restaurant in accordance with the then current plans and specifications of" McDonald's. Further, the "Tenant shall not make any change in, alteration of, or addition to any part of the Premises, or remove any of the buildings or building fixtures without, in each instance, obtaining the prior written consent of Landlord and complying with all government rules, ordinances and regulations." .*Id.*, § 4.03. Also, all "fixtures and equipment and all other articles of property which, at the date of tenant takes possession of the premises, are the property of Landlord... Any additions, alterations or remodeling of improvements made to the Premises will immediately become the property of landlord and will not be removed by tenant at the termination of this lease or lapse of time or otherwise." *Id.*, § 5.01. In short, McDonald's controls every aspect of the building design, the fixtures, the equipment, the layout, the operations, and even the hours that a franchisee can operate the store.

130.     McDonald's and its franchisees also have shared employee resources. McDonald's provides extensive training programs for franchisee employees through its Hamburger University and other training initiatives. prospective franchisee owners, or Candidates, must go through rigorous training before they are considered as viable franchisees. Pursuant to the Candidate Agreements, McDonald's requires that Candidates "complete, to McDonald's satisfaction in its sole discretion, McDonald's Franchise Applicant Training and Evaluation Program consisting of McDonald's restaurant and classroom experience and training."[75] Training can be in excess of two

---

[74] *See* Franchise Disclosure Document, Operator's Lease, § 2.06.

[75] *See id.,* Candidate Agreement, Background.

years.[76] These programs are designed and controlled by McDonld's, ensuring all employees receive uniform training. McDonald's also offers human resources support to its franchisees including guidance on employment related issues, such as compliance with federal laws such as to the PUMP Act. McDonald's even controls the days and hours that the restaurants must be open.

131.     McDonald's communicates its directives and standards to franchisee owners from its headquarters in Illinois. McDonald's could have implemented policies and/or practices that require the Franchisee Defendants to comply with the PUMP Act. For example, McDonald's could have included in their Francise Agreement physical specifications for its restaurants that include appropriate and complaint spaces for lactating employees. Similarly, McDonald's could have included in its business manuals policies regarding break time accommodations for their employees. These communications, which directly relate to the claims Plaintiffs asserts here, would come from Illinois demonstrating that a substantial amount of the acts and omissions occurred in Illinois.

132.     Similarly, upon information and belief, the Franchisee Defendants have also ignored their obligations under the PUMP Act through their failure to provide appropriate breaks for lactating employees.  For example, the Franchisee Defendants could have sought permission to deviate from the physical specifications required or from the manual with respect to the mandated operating hours or could have established or sought to establish a policy regarding breaks for lactating employees.

133.     In violation of the PUMP Act, Defendants, throughout the relevant period, failed to provide reasonable break times for employees "to express breast milk for 1 year after the child's birth each time such employee needed to express milk. . . ." 29 U.S.C. § 218d(a)(2).

---

[76] *Id.*, ¶ 3.

134.    McDonald's had over ten years to update the McDonald's System to include training and procedural information detailing processes and guidelines for ensuring nursing employees had sufficient time and private, sanitary spaces to pump while working. McDonald's could have initiated training and guidance regarding nursing employees to assist franchisees in lactation accommodation. McDonald's repeatedly chose not to update the McDonald's System to provide a detailed procedure or guidelines for accommodating nursing employees.

135.    Similarly, the Franchisee Defendants could have made efforts to ensure that nursing employees had sufficient time to pump while working by creating and/or modifying its existing break policies to ensure employees had adequate time to pump as needed.

136.    Defendants knowingly, willfully, and systematically engaged in this unlawful practice of refusing to provide reasonable breaks to express breast milk to Plaintiff and those similarly situated in violation of the PUMP Act.

137.    Plaintiffs will request that the Court authorize notice to all current and former employees of Defendants who required a space to pump milk from December 29, 2022 to the date the notice is sent to inform them of the pendency of this action and their right to "opt-in" to this lawsuit pursuant to 29 U.S.C. § 216(b) for the purpose of seeking damages, attorneys' fees, litigation costs, declaratory and injunctive relief, and all other relief available.

138.    Defendants violated the rights of Plaintiffs and members of the McDonald's and Franchisee Collectives under the PUMP Act by failing to provide reasonable break times to express breast milk.

139.    Defendants violated the rights of Plaintiffs and members of the McDonald's and Franchisee Collectives by failing to institute policies and practices that comply with the PUMP Act.

140. Defendants are liable to Plaintiffs and members of the McDonald's and Franchisee Collectives for legal and equitable relief in the form of damages and other relief pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

## SECOND COUNT
### Violation of the FLSA and PUMP Act
### [29 U.S.C. § 218d(a)(2)]
### (Brought on Behalf of Plaintiffs and the members of the McDonald's Collective and Franchisee Collective)

141. Paragraphs 1 through 140 herein are re-alleged and incorporated by reference into this Second Count.

142. Plaintiffs and the members of the McDonald's Collective and Franchisee Collective are similarly situated individuals within the meaning of the FLSA, 29 U.S.C. § 216(b).

143. The FLSA, at 29 U.S.C. § 218d(a)(2), states that an "employer shall provide: . . . (2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." Throughout the relevant period, McDonald's exercised control, directly or indirectly, over the employees and operations of the Franchisee Defendants. McDonald's exercises control, directly or indirectly, over the working conditions at the Franchisee Defendants' restaurants that relate to safety and health of employees — specifically, lactation accommodations. They do so through their control over the specifications governing the physical space for the franchised restaurant and through their establishment, coordination, and training regarding employee and operational policies.

144. For example, Section 4 of the Franchise Agreement states that McDonald's provides its franchisees with business manuals that govern nearly every aspect of operating the business. Franchisees must "adopt and use exclusively" the materials in the manuals. Failure to do so can result in a material breach of the franchise agreement.

145.    The Franchise Agreement states that each restaurant must "comply with the entire McDonald's System" and that franchisees must "maintain the building, fixtures, equipment . . . in compliance with designated standards" that are prescribed by McDonald's. Further, the franchisee must "construct and equip" the building in accordance with the McDonald's System and cannot modify or make any additions or alterations to the building or the layout without approval of McDonald's. McDonald's even controls the days and hours that the restaurants must be open.

146.    Further, McDonald's also serve as the landlord for their franchisees and includes a lease agreement as part of the Franchise Agreement.[77] Under the terms of the Lease, McDonald's "will construct or have others construct or remodel or otherwise prepare the Premises for a McDonald's Restaurant in accordance with the then current plans and specifications of" McDonald's. Further, the "Tenant shall not make any change in, alteration of, or addition to any part of the Premises, or remove any of the buildings or building fixtures without, in each instance, obtaining the prior written consent of Landlord and complying with all government rules, ordinances and regulations." Also, all "fixtures and equipment and all other articles of property which, at the date of tenant takes possession of the premises, are the property of Landlord... Any additions, alterations or remodeling of improvements made to the Premises will immediately become the property of landlord and will not be removed by tenant at the termination of this lease or lapse of time or otherwise." In short, McDonald's controls every aspect of the building design, the fixtures, the equipment, the layout, the operations, and even the hours that a franchisee can operate the store.

147.    Similarly, the Franchisee Defendants also could have provided their employees with lactation accommodations by seeking from McDonald's a portable lactation space or use of

---

[77] *See* Franchise Disclosure Document, Operator's Lease, § 2.06.

45

a sanitary, secure space within their premises beyond that specified in the Operating Manual to allow for lactation accommodations for their employees.

148.     The Franchisee Defendants also could have provided their employees with lactation accommodations by seeking from McDonald's a deviation from their standard policies regarding the physical layout of the premises or the space to be utilized for lactation accommodations.

149.     In violation of the PUMP Act, Defendants, throughout the relevant period, failed to provide "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." 29 U.S.C. § 218d(a)(2).

150.     Despite requests from nursing employees, Defendants failed to provide a "functional," non-bathroom space within which Plaintiffs and similarly situated employees could express breast milk without worrying about being intruded upon, in violation of the FLSA.

151.     As discussed, McDonald's-branded restaurants must adhere to the standard and policies outlined by McDonald's in the McDonald's System, including design and layout of each restaurant. McDonald's has the right to periodically inspect the restaurants to ensure the franchisee is complying with their standards and specifications.

152.     McDonald's failed to incorporate pumping accommodations into its "McDonald's System" and building designs. As discussed, McDonald's controls nearly every aspect of the structural design and layout of each McDonald's-branded restaurant. Upon information and belief, McDonald's dictates that the design of each restaurant include a backroom and a restroom for their employees because these are basic human necessities and help facilitate a productive workforce. The PUMP Act clarifies that lactation accommodations are also necessary in the workplace that employers must provide to their employees. McDonald's failed to require its franchisees to include

46

a space where nursing employees could pump and failed to design the restaurants to accommodate such a space. Under the Lease Agreement that is part of the Franchise Agreement, McDonald's can remodel the restaurants in accordance with its plans. The remodel, which McDonald's controls and can impose on franchisees, includes new signs, trade fixtures, and equipment.[78] Despite having over ten years to incorporate a secure, private space in each restaurant, McDonald's chose not to include these accommodations. Just five years ago, McDonald's Corp. announced plans to remodel nearly all McDonald's-branded restaurants in the U.S.[79] Defendants failed to include a functional space for pumping for its employees in the remodel.

153. In addition, the Franchisee Defendants failed to incorporate pumping accommodations in their restaurants. While McDonald's exercises control over the structural design and layout of each McDonald's Restaurant, the Franchisee Defendants could have accommodated its nursing employees by installing a portable lactation space of pod or by closing off a shared space accessible to all employees and making it private for use by its lactating by, for example, installing a lock on the doors. Upon information and belief, the Wendy's Franchisee Defendants chose, however, not to do so.

154. Defendants knowingly, willfully, and systematically engaged in this unlawful practice of refusing to provide sufficient lactation support to Plaintiffs and those similarly situated, in violation of the PUMP Act.

155. Plaintiffs will request that the Court authorize notice to all current and former employees of Defendants who required and asked for a private space to pump milk from December 29, 2022, to the date the notice is sent to inform them of the pendency of this action and their right

---

[78] *See* Franchise Disclosure Document, Operator's Lease, § 2.06.

[79] *See* https://www.cbsnews.com/news/mcdonalds-plans-6-billion-makeover-of-its-restaurants/ (last accessed February 12, 2024).

to "opt in" to this lawsuit pursuant to 29 U.S.C. § 216(b) for the purpose of seeking damages, attorneys' fees, litigation costs, declaratory and injunctive relief, and all other relief available.

156.     Defendants violated the rights of Plaintiffs and members of the Collectives under the PUMP Act by failing to provide an appropriate, clean, and secure place free from intrusion within which to pump breast milk.

157.     Defendants violated the rights of Plaintiffs and the FLSA Collective by failing to institute policies and practices that comply with the PUMP Act.

158.     Defendants are liable to Plaintiffs and the members of the Collectives for legal and equitable relief in the form of damages and other relief, pursuant to 29 U.S.C. § 216(b), as well as reasonable attorneys' fees, costs, and expenses. *See* 29 U.S.C. § 216(b).

**WHEREFORE**, Plaintiffs pray for the following relief on behalf of themselves and the members of the Collectives:

A.     An Order from this Court permitting this litigation to proceed as a collective action pursuant to 29 U.S.C. § 216(b);

B.     An Order from this Court ordering Defendants to post a copy of an agreed-upon and court-approved notice in a common space visible to employees at each McDonald's-branded restaurant across the country;

C.     An Order from this Court ordering Defendants to provide the undersigned with the names, addresses, email addresses, and telephone numbers of all female employees who, from January 1, 2022, to the present, have taken leave from work under the Family Medical Leave Act;

D.     An Order from this Court ordering Defendants to send, via email, intranet platform, or SMS a copy of the agreed-upon and court-approved notice to all female employees who, from January 1, 2022, to the present, have taken leave from work under the Family Medical Leave Act;

E.     Adjudicating and declaring that Defendants' conduct as set forth herein and above is in violation of the FLSA;

F.      Adjudicating and declaring that Defendants violated the FLSA by failing to provide reasonable break time and private, sanitary, non-bathroom lactation spaces for nursing mothers;

G.      Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violations of the FLSA;

H.      Awarding Plaintiffs and members of the Collectives legal and equitable damages in an amount consistent with the FLSA;

I.      Awarding Plaintiffs and members of the Collectives punitive damages;

J.      Awarding Plaintiffs reasonable attorneys' fees and all costs of this action, to be paid by Defendants, in accordance with the FLSA;

K.      Awarding pre-and post-judgment interest and court costs as further allowed by law;

L.      Granting Plaintiffs leave to add additional plaintiffs by motion, the filing of written opt in consent forms, or any other method approved by the Court; and

M.      Awarding any further legal or equitable relief the Court deems just, equitable, and/or appropriate.


**SIRI & GLIMSTAD LLP**

*/s/Lisa R. Considine*
Lisa R. Considine
Oren Faircloth (*pro hac vice* )
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (212) 532-1091
E: lconsidine@sirillp.com
E: ofaircloth@sirillp.com

*Attorneys for Plaintiffs and Members of the Collective*